UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------

ROBERT DALL,

                         Plaintiff,                    **MEMORANDUM & ORDER**
                                                       11-CV-0444 (MKB)
            v.

ST. CATHERINE OF SIENA MEDICAL CENTER,

                         Defendant.
---------------------------------------------------------------

MARGO K. BRODIE, United States District Judge:

Plaintiff Robert Dall brings the above-captioned action against Defendant St. Catherine

of Siena Medical Center ("Medical Center"), asserting claims of gender discrimination, hostile

work environment, and retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C.

§ 2000e *et seq.* ("Title VII"), and the New York State Human Rights Law, N.Y. Exec. Law § 290

*et seq*. ("NYSHRL").  Defendant moved for summary judgment on all claims.  For the reasons

set forth below, the Court denies Defendant's motion for summary judgment as to Plaintiff's

gender discrimination claim, and grants Defendant's motion for summary judgment as to

Plaintiff's hostile work environment and retaliation claims.

## I.  Background

On January 8, 2001, Plaintiff was hired as a per diem special procedures technician in the

radiology department by Defendant, a not-for-profit hospital located in Smithtown, New York.

(Def. 56.1 ¶ 1; Pl. 56.1 ¶ 1.)  On April 28, 2002, he was promoted to a full-time special

procedures technician, and on May 16, 2005, Plaintiff's job title was changed to MRI technician.

(Def. 56.1 ¶¶ 20, 22; Pl. 56.1 ¶¶ 20, 22.)  Plaintiff was a member of the Union which represented

the Medical Center's health care professionals, and was elected President of the Union in 2004.

(Def. 56.1 ¶¶ 28–29, Pl. 56.1 ¶¶ 28–29.)

In or about March 2007, Beatrice Birmingham began working as a nurse in the radiology department. (Def. 56.1 ¶ 65; Pl. 56.1 ¶ 65.1.) According to Plaintiff, Birmingham regularly acted in a sexually explicit manner while at work. (Pl. 56.1 ¶ 65.3.) Birmingham told sexually explicit stories, visited explicit websites on work computers, showed employees a drawing of her vagina, described her boyfriend's genitalia, brought a chocolate penis to work, openly discussed her personal sex toys, and regularly told co-workers her "lips were made for blow jobs." (Pl. Dep. 108:5–112:24, 195:13–196:24, 222:1–15.) Plaintiff found Birmingham's behavior to be "offensive" and "downright disgusting," and the behavior made him uncomfortable. (Pl. Dep. 221:16–222:15.) Plaintiff and others in the department told Birmingham that she was disclosing "too much information," or that "we don't need to go there." (Id. at 110:1–7, 121:16–21.) Both Plaintiff and Andrea Scott, a nurse employed at the Medical Center, witnessed Birmingham bring in a photograph of her ex-husband's genitalia and show it to coworkers in the radiology department. (Id. at 111:12–19; Scott Decl. ¶ 5.) According to Susan Horn, a nurse employed at the Medical Center, Bonnie Wilson, a nurse formerly employed at the Medical Center, and Karalyn Krieger, a computed tomography technologist ("CT tech") currently employed by the Medical Center, Birmingham routinely acted in a manner inappropriate for the workplace. (Horn Dep. 10:3–14; Wilson Decl. ¶ 5; Krieger Decl. ¶ 4.) Birmingham wore tight clothing and sat on the laps of male coworkers. (Horn Dep. 12:7–13:15.) According to Horn, Birmingham's behavior, including frequent conversations of a sexual nature, made the work environment uncomfortable. (Horn Dep. 10:11–12:6.)

On December 12, 2009, the employees of the radiology department were invited to attend an annual holiday party at Mediterranean Manor on Long Island. (Def. 56.1 ¶¶ 55–60; Pl. 56.1 ¶¶ 55–60.) When Plaintiff arrived at the party, Birmingham told Plaintiff that she was "going

commando," or not wearing underwear, under her dress. (Pl. Dep. 125:4–25.) Birmingham and Anne Marie Hawkins, another radiology nurse, were "visible intoxicated," at the party. (Scott Decl. ¶ 6; Pl. Dep. 125:2–3.) During the event, Birmingham and Hawkins waited for all the male individuals to gather around with their telephones and cameras and started kissing. (Pl. Dep. 126:1–19.) While Birmingham was posing for a photograph, Plaintiff used his cellular telephone to take a photograph of her when her leg was raised. (Pl. Dep. 126:1–19; Hawkins Aff. ¶¶ 5, 6.) According to Plaintiff, the photograph was of Birmingham's knee and lower thigh, (Pl. Dep. 126:19, 129:13–14), and, according to Wilson, the photo did not show anything explicit or inappropriate (Wilson Decl. ¶ 6). According to Hawkins, Plaintiff told her that he took the photograph underneath Birmingham's dress and that it was a photograph of her "ass." (Hawkins Aff. ¶¶ 6, 8.) Danielle Robbins, Defendant's human resources representative, testified that Hawkins and Birmingham acted inappropriately at the party, kissing and dancing with each other. (Robbins Dep. 40:10–41:17.)

When Plaintiff showed Birmingham the photograph at the party, Birmingham did not ask him to delete it. (Pl. Dep. 127:7–9.) In the days following the party, Defendant maintains that Plaintiff proceeded to show the photograph to other employees at the Medical Center. (Def. Mem. 5; Robbins Aff. ¶ 10.) According to Plaintiff, Hawkins approached Plaintiff and asked to see his telephone. (Pl. Dep. 130:18–131:10.) Plaintiff handed Hawkins his telephone, and he observed her showing the photograph to other employees. (Pl. 56.1 ¶ 75; Pl. Dep. 130:18–133:24.).

In early January 2010, Plaintiff and Birmingham had a verbal confrontation relating to a patient. (Pl. Dep. 134:17–135:25; Krieger Decl. ¶ 7.) According to Plaintiff, Birmingham disappeared while at work and refused to assist a patient, and Plaintiff complained to his

supervisor, Dave Cook.  (Pl. Dep. 134:18–20.)  Cook complained to Gayle Romano, Birmingham's supervisor.  (*Id*. at 134:18–20.)  Birmingham approached Plaintiff about his complaint, and Plaintiff told her that if "she put half the effort into doing her work as she did to this, she'd be a halfway decent nurse."  (*Id.* at 134:23–135:7.)  Following the confrontation, Birmingham was upset.  (Pl. 56.1 ¶¶ 76.6–76.8; Krieger Decl. ¶ 7.)

On January 10, 2010, within a day or two of the confrontation between Plaintiff and Birmingham, and a month after the holiday party, Birmingham filed a complaint of sexual harassment with her supervisor, Romano, against Plaintiff for taking the photograph and allegedly circulating it at the Medical Center.  (Def. 56.1 ¶ 77; Pl. 56.1 ¶ 77; Krieger Decl. ¶¶ 7–8.)  In Birmingham's complaint, she stated that she first heard about Plaintiff's photograph during the week after the holiday party.  (Beldner Decl. Ex. G ("Birmingham Compl.").)  During her deposition, however, Birmingham stated that she filed her complaint the morning after she was informed by Hawkins that Plaintiff was showing the photograph to others at the Medical Center.  (Birmingham Dep. 43:3–47:21.)

The day after Birmingham filed her complaint, Plaintiff approached her in the hallway at the Medical Center, asked her why she filed her complaint, and stated that the Medical Center was going to try to fire him.  (Pl. Dep. 147:1–24.)  Plaintiff told her that he was not showing the photograph around — he "wouldn't do such a thing."  (*Id.* at 147:22–148:1.)  Birmingham told him that she needed to speak to Romano and that she would get back to Plaintiff.  (*Id*. at 148:2–4.)  Birmingham did not follow up with Plaintiff, so later that evening, Plaintiff sent a text message to Birmingham stating "How could you do that to somebody?"  (*Id*. at 148:11–16.)  After Birmingham did not respond, Plaintiff spoke to her boyfriend Steve, a CT tech at the Medical Center, and asked him what was going on.  (*Id.* at 148:15–22.)  Steve told Plaintiff that

Birmingham was not allowed to speak to Plaintiff, and that she "better not and could not rescind her complaint." (*Id*. at 148:21–25.) According to Scott, Birmingham did attempt to rescind her complaint against Plaintiff, but Romano, Birmingham's supervisor, would not allow her to do so. (Scott Decl. ¶ 8.) According to Wilson, Birmingham did not want to file the complaint against Plaintiff in the first place, but the Medical Center management pressured her into doing so. (Wilson Decl. ¶ 11.)

Robbins conducted an investigation as a result of Birmingham's complaint. (Def. 56.1 ¶ 113; Pl. 56.1 ¶ 113.) According to Robbins, she interviewed three individuals identified by Birmingham as having witnessed Plaintiff's inappropriate conduct, and each employee confirmed Birmingham's allegations. (Robbins Aff. ¶¶ 14–20; Hawkins Aff. ¶ 10.) Robbins interviewed Hawkins, who informed Robbins that she wanted "to remain confidential because she feared that Plaintiff would retaliate against her." (Robbins Aff. ¶ 15.) Hawkins informed Robbins that Plaintiff had shown her the photograph of Birmingham on his telephone and told her he took the photograph underneath Birmingham's dress at the holiday party. (*Id*. ¶ 16.) Hawkins also told Robbins that she witnessed Plaintiff showing the photograph to other employees at the workplace. (*Id*.) Robbins also spoke with Charles Maury and Bonnie Wilson, two other employees in the radiology department. (*Id*. ¶ 17.) Maury told Robbins that he had observed Plaintiff show the photograph to Birmingham at the holiday party and that Birmingham requested that Plaintiff delete the photograph. (*Id*. ¶ 18.) Plaintiff later showed Maury the photograph and stated that it was a photograph of Birmingham's "ass." (*Id*. ¶ 18.) Birmingham confided in Maury that she was "distraught over the incident and felt that her personal space had been violated." (*Id*. at ¶ 19.) Wilson told Robbins that Plaintiff had shown her a photograph in

the workplace that "looked like 'flesh' and advised her that the photograph was a picture he had taken at the Holiday Party of Ms. Birmingham's thigh." (*Id*. at ¶ 20.)

On January 12, 2010, two days after Birmingham filed her sexual harassment complaint against Plaintiff, Robbins met with Plaintiff to discuss Birmingham's complaint. (Def. 56.1 ¶¶ 119–24; Pl. 56.1 ¶¶ 119–24.) Plaintiff admitted that he had used his cellular telephone to take a photograph of Birmingham at the holiday party. (Def. 56.1 ¶ 122; Pl. 56.1 ¶ 122; Robbins Aff. ¶ 21.) According to Robbins, Plaintiff admitted that he took the photograph under Birmingham's dress and had shown the photograph and permitted the photograph to be shown to co-workers within the radiology department. (Robbins Aff. ¶ 21.) Plaintiff told Robbins repeatedly that "he did not believe that he had done anything wrong, either in taking the picture or circulating the picture throughout the [r]adiology [d]epartment." (*Id.*) Robbins told Plaintiff that she would continue to investigate the complaint and that he should "refrain from contacting Ms. Birmingham regarding her complaint." (*Id.* ¶ 23.) Plaintiff maintains that he offered to show Robbins the photograph in order to demonstrate that there was nothing inappropriate about it but Robbins declined to view the photograph. (Pl. Decl. ¶ 3.) Plaintiff denies being told not to contact Birmingham. (*Id.* ¶ 4.) Plaintiff asked Robbins whether the situation would be resolved if Birmingham rescinded her complaint, and Robbins informed him that, if Birmingham rescinded her complaint, there would be nothing for Robbins to investigate. (*Id.*)

According to Wilson, she was asked by Dominic Pernice, the Director of Radiology, and Gayle Romano, Director of Critical Care and Radiology Nursing, to submit a written statement against Plaintiff. (Wilson Decl. ¶ 8.) Although she initially told them that she was not comfortable because she did not want to be involved and she did not believe that Plaintiff had done anything wrong, she eventually agreed after numerous requests by Pernice and Romano.

(Wilson Decl. at ¶¶ 8–9.)  Wilson maintains that she was pressured into submitting the statement.  (*Id*. at ¶ 10.)

On January 13, 2010, two days after Birmingham filed her sexual harassment complaint against Plaintiff, Plaintiff filed a sexual harassment complaint with Robbins against Birmingham, setting forth Birmingham's sexually inappropriate behavior in the workplace.  (Def. 56.1 ¶¶ 126–129.)  Plaintiff maintains that he had not previously filed a complaint because he was afraid of retaliation and did not want to cause any problems, but by filing a complaint against him, Birmingham "made it fair to go out and complain."  (Pl. Dep. 142:20–143:6.)  Plaintiff approached three co-workers — RJ Klein, Rich Garrant, and Karolyn Krieger — and asked them to submit statements confirming the allegations in his complaint.  (Def. 56.1 ¶ 140; Pl. 56.1 ¶ 140.)  Garrant and Krieger testified that they were not pressured or coerced into signing the statement they submitted in support of Plaintiff's complaint.  (Garrant Dep. 16:9–18, 22:17–22; Krieger Decl. ¶ 5.)  Klein told Robbins that he was pressured by Plaintiff to submit a statement in support of Plaintiff's complaint.  (Def. 56.1 ¶ 153; Pl. 56.1 ¶ 153.1.)  Klein, Garrant and Krieger confirmed that Birmingham routinely acted in a sexually inappropriate manner.  (Pl. 56.1 ¶¶ 150–66.)  Robbins testified that she thought both Birmingham and Plaintiff acted inappropriately, but that Birmingham acted more inappropriately.  (Robbins Dep. 70:2–25.)

During the course of Robbins's investigation, she conversed with Lynda Larson, Plaintiff's Union Advisor.  (Pl. Dep. 166:19–167:3; Robbins Dep. 84:22–85:9.)  According to Larson, Robbins told her that the Medical Center had a "zero tolerance policy" with respect to sexual harassment and was therefore seeking to terminate Plaintiff's employment.  (Larson Decl. ¶ 5.)  Based on those conversations, Larson understood that Defendant was "unequivocally seeking the termination" of Plaintiff.  (Larson Decl. ¶ 6.)  Larson therefore communicated to

Plaintiff that he would be terminated if he did not resign. (Pl. Dep. 224:24–225:6.) Plaintiff claims that Robbins communicated directly to him that he would be terminated if he did not resign. (Pl. Dep. 224:18–225:2.) According to Plaintiff, Robbins made it clear that suspension was not an option and told him that she was "being pressured by a committee" to terminate him. (Pl. Dep. 152:2–6.) Robbins maintains that she did not request Plaintiff's resignation or advise Plaintiff that he would be terminated if he did not resign. (Robbins Aff. ¶ 38.)

On January 15, 2010, Plaintiff met with Robbins to discuss the results of the investigation. (Def. 56. ¶ 187; Pl. Dep. 152:1–154:9.) According to Robbins, at the time of this meeting, the Medical Center had not yet decided what disciplinary action would be imposed against Plaintiff. (Robbins Aff. ¶ 37.) On January 15, 2010, Plaintiff resigned. (Def. 56.1 ¶ 194; Pl. 56.1 ¶ 194.) Plaintiff testified that he resigned after the meeting in a letter which stated he was leaving due to the hostile work environment caused by Birmingham. (Pl. Dep. 154:7–9.)

Robbins testified that, following her investigation, a determination was made to suspend Birmingham, and she believed Birmingham was suspended.[1] (Robbins Dep. 98:19–99:7.) Following the investigation, all employees in the radiology department were required to attend mandatory sexual harassment training. (Def. 56.1 ¶ 179; Pl. 56.1 ¶ 179.)

## II. Discussion

### a. Standard of Review

Summary judgment is proper only when, construing the evidence in the light most favorable to the non-movant, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Kwong v. Bloomberg*,

---

[1] According to Birmingham, she was never formally disciplined. (Birmingham Dep. 64:5–65:19.)

--- F.3d ---, ---, 2013 WL 3388446, at *4 (2d Cir. July 9, 2013); *Redd v. N.Y. Div. of Parole*, 678 F.3d 166, 174 (2d Cir. 2012). The role of the court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ.*, 444 F.3d 158, 162 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). A genuine issue of fact exists when there is sufficient "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. The "mere existence of a scintilla of evidence" is not sufficient to defeat summary judgment; "there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* The court's function is to decide "whether, after resolving all ambiguities and drawing all inferences in favor of the non-moving party, a rational juror could find in favor of that party." *Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 398 (2d Cir. 2000). The Second Circuit has "cautioned that '[w]here an employer acted with discriminatory intent, direct evidence of that intent will only rarely be available, so affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination.'" *Taddeo v. L.M. Berry & Co.*, --- F. App'x ---, ---, 2013 WL 1943274, at *1 (2d Cir. May 13, 2013) (quoting *Gorzynski v. JetBlue Airways Corp.*, 596 F .3d 93, 101 (2d Cir. 2010)).

### b. Gender Discrimination Claim

Plaintiff claims that he was treated differently, and constructively terminated, on account of his gender. Title VII prohibits an employer from discharging or discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). Thus, "[a]n employment decision . . . violates Title VII when it is 'based in whole or in part on discrimination.'" *Holcomb v. Iona College*, 521 F.3d 130, 137 (2d Cir. 2008) (quoting *Feingold v. New York*, 366 F.3d 138, 152 (2d Cir. 2004)).

Title VII claims are assessed using the burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).[2] *See Mills v. S. Conn. State Univ.*, --- F. App'x ---, 2013 WL 2157955, at *1 (2d Cir. May 21, 2013) (applying *McDonnell Douglas* framework to gender discrimination claim).  Under the framework, a plaintiff must first establish a prima facie case of discrimination.  *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993); *see also Ruiz v. County Of Rockland*, 609 F.3d 486, 491 (2d Cir. 2010).  Plaintiff's burden at this stage is "minimal."  *Holcomb*, 521 F.3d at 139 (quoting *Hicks*, 509 U.S. at 506).  If Plaintiff satisfies this initial burden, the burden then shifts to Defendant to articulate a legitimate, nondiscriminatory reason for its actions.  *Hicks*, 509 U.S. at 506–07; *Ruiz*, 609 F.3d at 492.  Defendant's burden "is not a particularly steep hurdle."  *Hyek v. Field Support Servs.*, 702 F. Supp. 84, 93 (E.D.N.Y. 2010).  It "is one of production, not persuasion; it 'can involve no credibility assessment.'"  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) (quoting *Hicks*, 509 U.S. at 509).  If Defendant offers a legitimate, nondiscriminatory explanation for its action, summary judgment must still be denied, however, if Plaintiff can show that "the evidence in plaintiff's favor, when viewed in the light most favorable to the plaintiff, is sufficient to sustain a reasonable finding that his dismissal was motivated at least in part by [gender] discrimination."  *Adamczyk v. N.Y. Dep't of Corr. Servs.*, 474 F. App'x 23, 25 (2d Cir. 2012) (quoting *Tomassi v. Insignia Fin. Grp., Inc.*, 478 F.3d 111, 114 (2d Cir. 2007)); *see also Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. ---, ---, 133 S. Ct. 2517, 2522–23 (2013) ("An

---

[2]  The burden of proof and production for employment discrimination claims under Title VII and the NYSHRL are identical.  *Hyek v. Field Support Servs., Inc.*, 461 F. App'x 59, 60 (2d Cir. 2012) ("Claims brought under the NYSHRL 'are analyzed identically' and 'the outcome of an employment discrimination claim made pursuant to the NYSHRL is the same as it is under . . . Title VII.'" (alteration in original) (quoting *Smith v. Xerox Corp.*, 196 F.3d 358, 363 n. 1 (2d Cir. 1999))).  Therefore, Plaintiff's Title VII and NYSHRL discrimination claims are analyzed together for purposes of this motion.

employee who alleges status-based discrimination under Title VII need not show that the causal link between injury and wrong is so close that the injury would not have occurred but for the act. So-called but-for causation is not the test. It suffices instead to show that the motive to discriminate was one of the employer's motives, even if the employer also had other, lawful motives that were causative in the employer's decision."); *Edwards v. Huntington Union Free Sch. Dist.*, No. 11-CV-1408, 2013 WL 3785620, at *5 (E.D.N.Y. July 18, 2013) (explaining the burden shifting analysis for Title VII claims).

Defendant argues that Plaintiff cannot establish a prima facie case because there is no adverse action and no inference of discrimination. (Def. Mem. 10–15.) For the following reasons, viewing all facts in the light most favorable to Plaintiff, the Court finds that Plaintiff has presented sufficient evidence from which a reasonable jury could find that Plaintiff suffered gender based discrimination.

### i. Plaintiff's Prima Facie Case

To establish a prima facie case of employment discrimination under Title VII, a plaintiff must show that: (1) he belongs to a protected class; (2) he was qualified for the position in question; (3) he suffered an adverse employment action; and (4) the adverse employment action occurred under "circumstances giving rise to an inference of gender discrimination." *Mills*, --- F. App'x at ---, 2013 WL 2157955, at *1; *see also Doe v. City of New York*, 473 F. App'x 24, 27 (2d Cir. 2012). Defendant concedes that Plaintiff satisfies the first two elements of his prima facie case. (Tr. 7:11–15; Def. Mem. 10.) Plaintiff has established that he is "a member of a protected class (male)," satisfying the first element. *Judge v. N.Y.C. Police Dep't*, No. 05-CV-2440, 2008 WL 852010, at *2 (S.D.N.Y. Mar. 27, 2008). Since Plaintiff was at his job for approximately nine years (Def. 56.1 ¶ 1; Pl. 56.1 ¶ 1) and Defendant does not dispute that he was qualified for his position, Plaintiff has satisfied the second element. *Slattery v. Swiss*

*Reinsurance Am. Corp.*, 248 F.3d 87, 92 (2d Cir. 2001) (holding that plaintiff who had been performing for seven years met the "minimal qualification for a job"); *Kerman-Mastour v. Fin. Indus. Regulatory Auth., Inc.*, 814 F. Supp. 2d 355, 367 (S.D.N.Y. 2011) (finding that plaintiff who worked for defendant for "eight years before she was terminated" and was promoted several times met the minimal requirements); *Gibbs v. City of New York*, No. 02-CV-2424, 2005 WL 497796, at *7 (S.D.N.Y. Jan. 21, 2005) (finding that plaintiff established the second prong of his gender discrimination claim where defendant did not dispute that he was qualified for his position). Defendant argues, however, that Plaintiff cannot show that he suffered an adverse employment action or that any adverse employment action occured under circumstances giving rise to discriminatory intent based on his gender. (Def. Mem. 10–11.)

### 1. Adverse Employment Action

Defendant argues that Plaintiff did not suffer an adverse action because he resigned rather than "wait for the [Medical Center] to determine the appropriate disciplinary action to be taken against him." (Def. Mem. 11.) Plaintiff maintains that he was constructively discharged because he was told that he would be terminated if he did not resign.[3] (Pl. Opp'n Mem. 14; Pl. Dep. 153:2–22.) In order to establish an adverse action, Plaintiff must demonstrate that he suffered "a materially adverse change in h[is] employment status or in the terms and conditions of his employment." *Kessler v. Westchester Cnty. Dep't of Soc. Servs.*, 461 F.3d 199, 207 (2d Cir. 2006). An adverse employment action is one which is "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Brown v. City of Syracuse*, 673 F.3d 141, 150 (2d Cir. 2012) (quoting *Joseph v. Leavitt*, 465 F.3d 87, 90 (2d Cir. 2006)); *see also Albuja v. Nat'l Broad. Co. Universal, Inc.*, 851 F. Supp. 2d 599, 606 (S.D.N.Y. 2012) (noting that to

---

[3] According to Defendant, it never requested Plaintiff's resignation or advised him that his employment would be terminated. (Def. Mem. 12.)

satisfy the "adverse employment action" requirement, a plaintiff must present an employment action that affected the deprivation of "some 'tangible job benefits' such as 'compensation, terms, conditions or privileges' of employment." (quoting *Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir. 2002)). A constructive discharge is "functionally the same as an actual termination" and therefore is considered an adverse employment action.[4] *Pa. State Police v. Suders*, 542 U.S. 129, 148 (2004); *see also Fitzgerald v. Henderson*, 251 F.3d 345, 357 (2d Cir. 2001) ("Adverse employment actions include discharge from employment. Such a discharge may be either an actual termination of the plaintiff's employment by the employer or a 'constructive' discharge."); *Edwards*, 2013 WL 3785620, at *8 ("A constructive discharge is 'functionally the same as an actual termination' and therefore is considered an adverse employment action." (quoting *Pa. State Police*, 542 U.S. at 148)); *Trachtenberg v. Dep't of Educ. of N.Y.C.*, No. 12-CV-7964, 2013 WL 1335651, at *6 (S.D.N.Y. Apr. 3, 2013) ("[A] 'constructive discharge' from employment does constitute an adverse employment action . . . .").

A constructive discharge occurs when an employer "intentionally create[s] an intolerable work atmosphere that force[s the plaintiff] to quit involuntarily." *Andersen v. Rochester City Sch. Dist.*, 481 F. App'x 628, 632 (2d Cir. 2012) (quoting *Serricchio v. Wachovia Secs. LLC*, 658 F.3d 169, 185 (2d Cir. 2011)), *cert. denied*, 133 S. Ct. 836 (2013); *see also Edwards*, 2013 WL 3785620, at *8 ("A constructive discharge occurs only 'when an employer intentionally creates a work atmosphere so intolerable that [the plaintiff] is forced to quit involuntarily.'" (quoting *Borski v. Staten Island Rapid Transit*, 413 F. App'x 409, 411 (2d Cir. 2011)) (internal quotation

---

[4] Defendant argues in both its Memorandum of Law and its Reply Memorandum of Law that Plaintiff's constructive discharge "claim" fails. (Def. Reply at 16.) Plaintiff clarified at oral argument that he was not asserting a separate constructive discharge claim, but rather sought to maintain his sexual harassment and retaliation claims on a theory of constructive discharge. (Oral Arg. Tr. 3:11–17.)

marks omitted)); *Stofsky v. Pawling Cent. Sch. Dist.*, 635 F. Supp. 2d 272, 299 (S.D.N.Y. 2009) ("Constructive discharge occurs when the employer, rather than acting directly, deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation." (quoting *Morris v. Schroder Capital Mgmt. Int'l*, 481 F.3d 86, 88 (2d Cir. 2007))). "To find that an employee's resignation amounted to a constructive discharge, 'the trier of fact must be satisfied that the . . . working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.'" *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 73 (2d Cir. 2000) (quoting *Lopez v. S.B. Thomas*, 831 F.2d 1184, 1188 (2d Cir. 1987)); *Delville v. Firmenich Inc.*, No. 08-CV-10891, 2013 WL 363391, at *10 n.9 (S.D.N.Y. Jan. 31, 2013) (quoting *Whidbee*, 223 F.3d at 73)); *see also Edwards*, 2013 WL 3785620, at *9 ("[I]n order to determine whether the work conditions were 'so intolerable as to compel resignation,' the conditions must be 'assessed objectively by reference to a reasonable person in the employee's position.'" (quoting *Petrosino v. Bell Atl.*, 385 F.3d 210, 229 (2d Cir. 2004))).

## A.  Threats of Termination

In order to establish constructive discharge, it is not enough for a plaintiff to resign instead of facing potential disciplinary charges, *Bailey v. N.Y.C. Bd. of Educ.*, 536 F. Supp. 2d 259, 266 (E.D.N.Y. 2007), nor is it enough for a plaintiff to fear termination, *Massie v. Ikon Office Solutions. Inc.*, 381 F. Supp. 2d 91, 96–100 (N.D.N.Y. 2005) (where plaintiff had received numerous warnings regarding his inadequate work performance and was told he might be terminated if he filed a complaint against his supervisor, his "fear of being terminated [was] not an adverse employment action because of its lack of consequence"). However, threats of termination may be sufficient to show constructive discharge. *Grey v. City of Norwalk Bd. of Educ.*, 304 F. Supp. 2d 314, 324 (D. Conn. 2004) (citing *Lopez v. S.B. Thomas, Inc.*, 831 F.2d

1184, 1188 (2d Cir. 1987)); *see also Chertkova v. Conn. Life Ins. Co.*, 92 F.3d 81, 89–90 (2d Cir. 1996) ("In *Lopez*, we held that telling plaintiff he would be fired following probation, 'no matter what he did to improve his allegedly deficient performance,' was sufficient alone to support a finding of constructive discharge." (quoting *Lopez*, 831 F.2d at 1188)); *Stout v. Town of Tonawanda Police Dep't*, No. 09-CV-261S, 2011 WL 1260049, at *4 (W.D.N.Y. Mar. 31, 2011) ("The most common constructive discharge case involves veiled or direct threats that failure to resign will result in discharge." (citation and internal quotation marks omitted)); *Silverman v. City of New York*, 216 F. Supp. 2d 108, 115–66 (E.D.N.Y. 2002) ("[A] number of courts in this circuit have held that threats of termination may be sufficient to establish constructive discharge."), *aff'd*, 64 F. App'x 799 (2d Cir. 2003); *Valdes v. N.Y.C. Dep't of Env. Protection*, No. 95-CV-10407, 1997 WL 666279, at *3 (S.D.N.Y. Oct. 27, 1997) ("[A]n employer's clearly expressed desire that an employee resign has been held sufficient to find a constructive discharge.").

Courts look to a variety of factors to determine whether threats of termination are sufficient, such as whether the threats of termination were repeated, direct, or involved additional adverse conduct. *See e.g. Murray v. Town of N. Hempstead*, 853 F. Supp. 2d 247, 270 (E.D.N.Y. 2012) (finding no constructive discharge where employee merely heard a rumor that supervisor wanted him terminated); *McCalla v. SUNY Downstate Med. Ctr.*, No. 03-CV-2633, 2006 WL 1662635, at *5 (E.D.N.Y. June 8, 2006) (finding that plaintiff successfully pled an adverse employment action where defendants presented plaintiff with a resignation letter and told him if he did not sign it, he would be fired and his career would be ruined); *Grey*, 304 F. Supp. 2d at 324 (noting that a variety of circumstances made employee's situation "intolerable," including: the repeated threat that her position would be eliminated; a rumored letter announcing her

termination; petty reprimands; and suggestion that the District buyback her contract and subsequent comment that she should consider herself "finished"); *Valdes*, 1997 WL 666279, at *3 ("plaintiff's allegation that his supervisors told him that 'it was best if [he] resigned' because he 'was going to be terminated' creates a triable issue of fact on the question of whether a constructive discharge occurred" (citation omitted)). "A triable issue of fact as to constructive discharge may be demonstrated by proof that an employee was presented with the decision to resign or be fired." *Rupert v. City of Rochester, Dep't of Env. Servs.*, 701 F. Supp. 2d 430, 440 (W.D.N.Y. 2010).

Plaintiff has presented evidence from which a jury could find that Defendant decided to terminate him, and that he was forced to choose between resignation and termination. According to Larson, Plaintiff's Union Advisor, Robbins informed her that Defendant was "unequivocally seeking the termination" of Plaintiff. (Larson Decl. ¶ 5.) Larson informed Plaintiff that he would be terminated if he did not resign and advised him to resign or risk "irreparable" damage to his reputation. (Pl. Dep. 224:24–225:2.) According to Plaintiff's testimony, Robbins communicated to him directly that he would be terminated if he did not resign. (Pl. Dep. 224:18–22.)[5] According to Plaintiff, Robbins made it clear that suspension was not an option

---

[5] Defendant cites to an earlier portion of Plaintiff's deposition testimony where Plaintiff appeared to indicate that only Larson, not Robbins, told him that he would be terminated if he did not resign. (Def. Reply 3–4.) Defendant argues that statements to the contrary must be disregarded. (*Id.* at 4.) During the same deposition, however, Plaintiff clarified that Robbins had indicated to him that he would be terminated. (Pl. Dep. 224:18–225:2.) Accordingly, the Court finds that a genuine issue of fact exists regarding whether Plaintiff heard directly from Robbins that he would be terminated. *See Barrows v. Seneca Foods Corp.*, 512 F. App'x 115, 119 (2d Cir. Feb. 2013) (holding that "gaps and inconsistencies" in the plaintiff's testimony as long as the testimony is not "wholly conclusory, contradictory, or incomplete" should go to the jury for the "jury to 'assess[ ] . . . a witness's credibility'" (alteration in original) (quoting *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 725 (2d Cir. 2010))); *Hodge v. Vill. of Southampton*, 838 F. Supp. 2d 67, 76 (E.D.N.Y. 2012) (stating that in order to find for a plaintiff

and told him that she was "being pressured by a committee" to terminate him.  (Pl. Dep. 152:1–153:8.)  Robbins informed him that if he resigned first, she would discontinue her investigation, rather than placing an official finding against Plaintiff in his folder.  (Pl. Dep. 153:3–8.)  Plaintiff testified that he believed, based on the communications from Robbins and Larson, that he would be terminated if he did not resign.  (Pl. Dep. 225:3–6.)

Defendant has presented contrary evidence indicating that it had not yet decided what disciplinary action would be imposed and that Robbins had not requested Plaintiff's resignation or advised Plaintiff that he would be terminated if he did not resign.[6]  (Def. Mem. 12; Robbins Aff. ¶ 38.)  However, it is for a jury to decide whether to credit Plaintiff's version or the Defendant's version of the facts.  *See In re Fosamax Products Liab. Litig.*, 707 F.3d 189, 194 n.4 (2d Cir. 2013) ("[T]he general rule remains that 'a district court may not discredit a witness's deposition testimony on a motion for summary judgment, because the assessment of a witness's credibility is a function reserved for the jury.'" (quoting *Fincher v. Depository Trust and Clearing Corp*., 604 F.3d 712, 725 (2d Cir. 2010)), *cert. denied*, 133 S. Ct. 2783 (2013); *Milfort v. Prevete*, No. 10-CV-4467, 2013 WL 519041, at *5 (E.D.N.Y. Feb. 13, 2013) ("[T]he credibility of witnesses is not to be assessed by the court on a motion for summary judgment. Resolutions of credibility conflicts and choices between conflicting versions of the facts are matters for the jury, not for the court on summary judgment." (citations and internal quotation marks omitted)).

---

at summary judgment, there need not be one interpretation of the deposition testimony, as long as "a rational jury" could draw the interpretation favorable to the non-moving party and it was "a reasonable" interpretation).

[6] Defendant states that Robbins was not the final decision maker with respect to a potential termination, but that it was a joint effort between Robbins and the Executive Vice President.  (Tr. 10:6–9.)

## B.    Availability of Grievance Procedures

Defendant maintains that, even if Plaintiff believed he was about to be terminated, he was not constructively discharged because he had rights under his Union's collective bargaining agreement ("Collective Bargaining Agreement").  (Def. Reply Mem. 16–17.)  "[C]ourts in this circuit generally have refused to find a constructive discharge where an employee had an avenue through which he could seek redress for the allegedly 'intolerable' work atmosphere leading up to his resignation, but failed to take advantage thereof."  *Silverman*, 216 F. Supp. 2d at 115 ("[T]he fact that [plaintiff] could have sought a hearing before being terminated eviscerates his claim that threats of termination created an 'intolerable' situation which left him with but one choice:  resignation."); *see also Spence v. Md. Cas. Co.*, 995 F.2d 1147, 1156–57 (2d Cir. 1993) (finding that a plaintiff claiming defendants deliberately attempted to make him ill in order to force him to resign failed to establish constructive discharge because, *inter alia*, he could have lodged a complaint with human resources about the behavior); *Weisbecker v. Sayville Union Free School Dist.*, 890 F. Supp. 2d 215, 235–36 (E.D.N.Y. 2012) (holding that a supervisor's recommendation that plaintiff be terminated was not a constructive discharge because, among other things, plaintiff had the "ability to request reasons for the recommendation from [the supervisor] and submit a response"); *Rodriguez v. Graham–Windham Servs. To Families & Children*, No. 99-CV-10447, 2001 WL 46985, at *6 (S.D.N.Y. Jan. 18, 2001) (finding that one of the reasons plaintiff's demotion did not result in constructive discharge was that she was aware of her employer's complaint resolution procedures but made no complaint to human resources alleging discrimination or mistreatment); *Katz v. Beth Israel Med. Ctr.*, No. 95-CV-7183, 2001 WL 11064, at *13 (S.D.N.Y. 2001) (holding that there was no constructive discharge where plaintiff voluntarily resigned after being "unfairly disciplined," yelled at, and threatened with termination at least once, because, among other things, she could have filed a grievance

regarding the unfair reprimands); *Stembridge v. City of New York*, 88 F. Supp. 2d 276, 284–85 (S.D.N.Y. 2000) (finding no constructive discharge where plaintiff was suspended without pay, an informal conference was scheduled to address the disciplinary charges against plaintiff, plaintiff was given the opportunity to appear at the conference with counsel, and plaintiff had the right to appeal and request a union hearing, but plaintiff resigned on the date of the informal conference and requested that it be cancelled, because "in light of the fair hearing and opportunity to be heard before an independent arbiter, a rational jury could not plausibly find that a reasonable person in plaintiff's situation would have felt compelled to resign").

However, these cases generally involve circumstances in which the plaintiff had access to a hearing prior to termination or had reason to believe that after-the-fact grievance procedures might be successful. *Rupert*, 701 F. Supp. 2d at 440–41 (distinguishing cases finding constructive discharge claims foreclosed and stating that it was "an unsettled proposition at best" as to whether such authority applied to circumstances in which "the plaintiff-employee [was] subject to automatic termination in the event that he or she chose not to grieve the decision"); *see, e.g. Silverman*, 216 F. Supp. 2d at 116 ("[T]he fact that [plaintiff] could have sought a hearing before being terminated eviscerates his claim that threats of termination created an 'intolerable' situation which left him with but one choice: resignation."), *aff'd*, 64 F. App'x 799 (2d Cir. 2003); *Bailey*, 535 F. Supp. 2d at 265–67 (finding that plaintiff-teacher who resigned before a hearing regarding disciplinary charges brought against him was not constructively discharged, as he could have responded to the charges and raised complaints of discrimination during the hearing); *Stembridge*, 88 F. Supp. 2d at 284–86 (finding no constructive discharge where "plaintiff had the opportunity to present his side of the story in the scheduled disciplinary hearing," because "[i]t is impossible to know whether the hearing could have actually remedied

the situation or address the . . . misconduct because plaintiff chose not to participate in the process"); *Weisbecker*, 890 F. Supp. 2d at 235–36 (finding that recommendation that plaintiff be terminated as a probationary teacher was not a constructive discharge because, among other things, plaintiff could have requested reasons for the recommendation and submitted a response); *Katz*, 2001 WL 11064, at *13 (finding that where plaintiff was aware of another employee successfully challenging her termination through after-the-fact grievance procedures and being reinstated, plaintiff failed to establish constructive discharge, because a reasonable person would not have felt compelled to resign since they knew they had an effective process available to them even if they were terminated).

Defendant maintains that the Collective Bargaining Agreement "explicitly provided Plaintiff with the opportunity to grieve any disciplinary actions with which he disagreed." (Def. Reply 17.) Although Defendant maintains that it had not yet decided whether to terminate Plaintiff, Plaintiff has presented evidence that he reasonably understood that the decision had been made. *See Rupert*, 701 F. Supp. 2d at 441 (distinguishing cases in which constructive discharge claims were foreclosed by failure to take "advantage of employer-provided opportunities to challenge the allegedly intolerable working conditions" because, among other things, plaintiff alleged that the defendant "clearly expressed its intention to terminate him upon the conclusion of the grievance process," and in none of the other cases "was the plaintiff-employee subject to automatic termination in the event that he or she chose not to grieve the decision"). Therefore, for purposes of this motion, the Court will assume that Plaintiff would have been terminated had he not resigned. Unlike most of the cases involving the availability of grievance procedures discussed above, Plaintiff could not have availed himself of grievance

procedures prior to resigning.  (Oral Arg. Tr. 11:10–12, 24:5–10.)  Instead, Plaintiff would have

had to wait to be terminated before challenging the decision.  (*Id.* at 11:10–12, 24:5–10.)

    Under the Collective Bargaining Agreement, an employee may complain to the

department head, then to human resources, and then the complaint may be appealed to the

arbitration board if the union so chooses.  (Donnelly Decl. Ex. F, Article XXII.)  Shortly prior to

Plaintiff's termination, he filed a sexual harassment complaint with human resources regarding

Birmingham's behavior.  *C.f. Rodriguez*, 2001 WL 46985, at *6 (on claims of race and age

discrimination, plaintiff could not establish she was constructively discharged following her

demotion because, *inter alia*, plaintiff never complained to human resources of discrimination or

mistreatment).  Plaintiff has presented evidence that, subsequent to his filing a complaint, two

department heads, Pernice and Romano, pressured Wilson into submitting a statement against

Plaintiff, (Wilson Decl. ¶¶ 8–9), Romano refused to allow Birmingham to withdraw her

complaint against Plaintiff, (Scott Decl. ¶ 8), and Defendant "unequivocally" sought Plaintiff's

termination, (Larson Decl. ¶ 5).  Since the first two steps of the grievance process involve the

department heads and human resources, a jury could determine that a reasonable person in

Plaintiff's position would have concluded that, if he waited to be terminated, the available

grievance procedures would not have impacted the outcome, since the relevant department heads

and human resources were the ones taking action against him and applying pressure to others to

submit statements against Plaintiff.[7]

---

[7]  Plaintiff argues that he thought grievance procedures would be a rubber stamp process
because he did not know of anyone who had been successful.  (Oral Arg. Tr. 22:9–19.)
Defendant disagrees, arguing that Plaintiff had previously been involved in the grievance process
and was aware of his contractual rights.  (Def. Mem. 22.)  The central inquiry is whether a
reasonable person in Plaintiff's position would have believed that they had no other option but
resignation.  *See Giller v. Oracle USA, Inc.*, 512 F. App'x 71, 74 (2d Cir. 2013) (holding that the

Defendant argues that, even if Plaintiff thought the relevant department heads and human resources were biased against him, independent decision-makers would have had ultimate authority regarding a complaint filed through the grievance procedures. (Oral Arg. Tr. 25:23–26:6.) According to the Collective Bargaining Agreement, a complaint denied by the department head and human resources could only be appealed to an outside arbitrator with the support of the Union, and Plaintiff was advised by his Union Advisor that he should resign or risk "irreparable" damage to his reputation. (Pl. Dep. 153:12–24, 224:18–225:6.) Plaintiff may reasonably have understood that he could not rely on a Union appeal. *See Rupert*, 701 F. Supp. 2d at 435 (stating that plaintiff, who did not request available arbitration procedures, may have reasonably understood his union representative's statement that "[t]hey were done[;][t]his was what I got" to mean that the union would refuse to arbitrate on his behalf and that retirement was the only viable option (alterations in original)). Under these circumstances, a reasonable jury could find that Plaintiff was compelled to resign, even though the Collective Bargaining Agreement allowed for grievance procedures post-termination. *See Chertkova*, 92 F.3d at 89 (noting that in *Lopez*, the Second Circuit held "that telling plaintiff he would be fired following probation, 'no matter what he did to improve his allegedly deficient performance,' was sufficient alone to support a finding of constructive discharge" (quoting *Lopez*, 831 F.2d at 1188)). Plaintiff has

---

standard for constructive discharge is whether the plaintiff's "working conditions are 'so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign'" (quoting *Terry v. Ashcroft*, 336 F.3d 128, 152 (2d Cir. 2003)); *Rupert v. City of Rochester, Dep't of Envtl. Servs.*, 701 F. Supp. 2d 430, 440 (W.D.N.Y. 2010) ("A triable issue of fact as to constructive discharge may be demonstrated by proof that an employee was presented with the decision to resign or be fired."). In light of Plaintiff's most recent experience with Defendant's grievance procedures, as discussed above, a reasonable jury could conclude Plaintiff thought he had no other option but to resign.

provided sufficient evidence to create a material issue of fact as to whether he suffered an adverse employment action.

## 2. Inference of Discrimination

Inference of discrimination "is a 'flexible [standard] that can be satisfied differently in differing factual scenarios.'" *Howard v. MTA Metro-N. Commuter R.R.*, 866 F. Supp. 2d 196, 204 (S.D.N.Y. 2011) (quoting *Chertkova*, 92 F.3d at 91). "No one particular type of proof is required to show that Plaintiff's termination occurred under circumstances giving rise to an inference of discrimination." *Ofoedu v. St. Francis Hosp. & Med. Ctr.*, No. 04-CV-1707, 2006 WL 2642415, at *14 (D. Conn. Sept. 13, 2006). An inference of discrimination can be raised by "showing that an employer treated [an employee] less favorably than a similarly situated employee outside his protected group." *Abdul-Hakeem v. Parkinson*, --- F. App'x ---, 2013 WL 3111300, at *1 (2d Cir. June 21, 2013) (quoting *Ruiz*, 609 F.3d at 493); *see also Shlafer v. Wackenhut Corp.*, 837 F. Supp. 2d 20, 25 (D. Conn. 2011) ("Plaintiff must set forth factual circumstances from which discriminatory motivation may be inferred. Discriminatory motivation may be established by allegations of preferential treatment given to similarly situated individuals, or remarks conveying discriminatory animus." (citations omitted)); *Mabry v. Neighborhood Defender Serv.*, 769 F. Supp. 2d 381, 392 (S.D.N.Y. 2011) ("Allegations supporting motive may include preferential treatment given to similarly situated individuals or remarks that convey discriminatory animus."). Such a showing "is a recognized method of raising an inference of discrimination for the purposes of making out a prima facie case." *Ruiz*, 609 F.3d at 493 (internal quotation marks omitted). "The 'standard for comparing conduct requires a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases,' such that 'the comparator must be similarly situated to the plaintiff in all material respects.'" *Abdul-Hakeem*, --- F. App'x at ---, 2013 WL 3111300, at *1 (quoting *Ruiz*,

609 F.3d at 494); *see also Drummond v. IPC Int'l, Inc.*, 400 F. Supp. 2d 521, 532 (E.D.N.Y. 2005) ("Under Second Circuit law, where a plaintiff seeks to make out a case of discrimination 'by pointing to the disparate treatment of a purportedly similarly situated employee, the plaintiff must show that [ ]he shared sufficient employment characteristics with that comparator so that they could be considered similarly situated.'" (alteration in original) (quoting *Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 64 (2d Cir. 1997))).

The two positions need not be identical however, they need only be "sufficiently similar" to support at least a "minimal inference that the difference in treatment may be attributable to discrimination." *Cutler v. Stop & Shop Supermarket Co., L.L.C.*, 513 F. App'x 81, 83 (2d Cir. 2013) (quoting *McGuiness v. Lincoln Hall*, 263 F.3d 49, 54 (2d Cir. 2001)); *see also DeFina v. Meenan Oil Co., Inc.*, No. 10-CV-5068, 2013 WL 596622, at *10 (E.D.N.Y. Feb. 15, 2013) ("The law does not require the employees to be similarly situated in all respects, but rather requires that they be similarly situated in all *material* respects." (citing *McGuiness*, 263 F.3d at 54)). "An employee is similarly situated to co-employees if they were (1) subject to the same performance evaluation and discipline standards and (2) engaged in comparable conduct." *Abdul-Hakeem*, --- F. App'x at ---, 2013 WL 3111300, at *1 (quoting *Ruiz*, 609 F.3d at 493–94) (internal quotation marks omitted); *see also Graham v. Long Island R.R.*, 230 F.3d 34, 39–40 (2d Cir. 2000) ("We have said that to satisfy *Shumway's* 'all material respects' standard for being similarly situated, a plaintiff must show that her co-employees were subject to the same performance evaluation and discipline standards. In addition, the standard we used in *Shumway* requires plaintiff to show that similarly situated employees who went undisciplined engaged in comparable conduct." (citations omitted)). "In other words, there should be an objectively identifiable basis for comparability." *Graham*, 230 F.3d at 40 (internal quotation marks omitted)

("Hence, the standard for comparing conduct requires a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases, rather than a showing that both cases are identical."). "Ordinarily, whether other employees are similarly situated is a factual issue that should be submitted to a jury, but '[t]his rule is not absolute . . . and a court can properly grant summary judgment where it is clear that no reasonable jury could find the similarly situated prong met.'" *Sweeney v. Leone*, No. 05-CV-871, 2006 WL 2246372, at *13 (D. Conn. July 31, 2006) (quoting *Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 n.2 (2d Cir. 2001)); *see also Lugo v. City of New York*, --- F. App'x ---, ---, 2013 WL 1811271, at *2 (2d Cir. May 1, 2013) (finding that the plaintiff had not provided "any information from which a reasonable jury could conclude that the officers referenced were similarly situated to" the plaintiff).

### A.   Similarly Situated

Defendant argues that Plaintiff and Birmingham were not similarly situated because Plaintiff and Birmingham held different positions and reported to different supervisors — Birmingham was a registered nurse supervised by Romano and Plaintiff was an MRI technician supervised by Pernice.  (Def. Mem. 14.)  Similarly situated employees do not necessarily need to share the same position, "[n]or do they necessarily need to report to the same supervisor." *Foss v. Coca Cola Enters.*, No. 07-CV-1322, 2011 WL 1303346, at *8 (E.D.N.Y. Mar. 31, 2011) ("'All material respects' does not . . . mean 'all respects.'" (quoting *McGuinness*, 263 F.3d at 53–54)); *see Gorzynski*, 596 F.3d at 109 n.7 ("Although an employee's position is relevant to the analysis, employees need not be of the exact same rank to be considered 'similarly situated.'"); *Berube v. Great Atl. & Pac. Tea Co.*, 348 F. App'x 684, 686 (2d Cir. 2009) ("[T]he fact that [the plaintiff] had a different supervisor from the employees he cites as comparators does not appear sufficient in itself to preclude [the plaintiff] from showing that he was subject to the same

workplace standards and disciplinary procedures."); *McGuinness*, 263 F.3d at 53–54 (it is a

"misreading" of Second Circuit law to hold that "another employee cannot be similarly situated

to a plaintiff unless the other employee had the same supervisor, worked under the same

standards, and engaged in the same conduct"); *Julian v. Securitas Sec. Servs. USA, Inc.*, No. 08-

CV-1715, 2010 WL 1553778, at *9 (D. Conn. Apr. 19, 2010) ("[T]he fact that different

employees were supervised and disciplined by different supervisors might make them

inappropriate comparators depending on the particular facts involved, but it does not as a matter

of law preclude the fact finder from making a comparison if the facts suggests that a comparison

is appropriate.").

Although Plaintiff and Birmingham held different jobs and were supervised by different

individuals, they worked at the Medical Center, in the same department, and were subject to the

same rules and regulations promulgated in Defendant's Sexual Harassment Policy.  Defendant's

Sexual Harassment Policy prohibits "[i]nappropriate or unwelcome conduct of a sexual nature"

by "employees, supervisors, patients, residents, visitors, vendors or any other person."  (Def.

56.1 ¶ 9.)  By its terms, the Sexual Harassment Policy applies to all employees, and Defendant

has not argued, nor is there any evidence to suggest, that the policy was applied more stringently

to MRI technicians than registered nurses.  *See Delia v. Donahoe*, 862 F. Supp. 2d 196, 216

(E.D.N.Y. 2012) (sufficient evidence that plaintiff and coworker were "subject to the same

workplace standards," even though the coworker, unlike plaintiff, was a supervisor, because

defendant's Workplace Violence Policy "explicitly state[d] that it [was] applicable to all

employees," and defendant did "not suggest[] that supervisory employees were subject to a

different set of standards with respect to violence or threatening actions in the workplace");

*White v. Conn., Dep't of Corr.*, No. 08-CV-1168, 2010 WL 3447505, at *5 (D. Conn. Aug. 24,

2010) (although employees held different positions and different ranks, a reasonable jury could find that they were similarly situated because the directive, by its terms, applied to "[e]ach employee," and there was no evidence to suggest that the directive was applied "more stringently to supervisory employees").  Although Plaintiff and Birmingham reported to different supervisors, both were investigated for violations of this universally applicably policy, not for "supervisor-specific" violations. *See White*, 2010 WL 3447505, at *6 (disregarding defendant's argument that plaintiff was subject to "supervisor specific" workplace standards where "the investigatory report and the recommendations for dismissal d[id] not mention any violations that were 'supervisor-specific,' instead focusing simply on [plaintiff's] behavior in allegedly violating the universally applicable [directive]").  Moreover, they were both investigated by Robbins.  (Def. 56.1 ¶¶ 138; Pl. 56.1 ¶ 138.)  Therefore, viewing the facts in the light most favorable to Plaintiff, it appears that Plaintiff was not subjected to different "workplace standards" than Birmingham and that they were similarly situated in all material respects.[8]

### B.    Comparable Conduct

Defendant also argues that Plaintiff's conduct — taking a photograph "under the dress of Ms. Birmingham" and sharing it with his co-workers — was objectively more severe than that of Birmingham.  (Def. Mem. 13–14.)  "When a plaintiff's misconduct is objectively more serious than that of a proposed comparator, differential treatment by the employer does not create an issue of fact that will defeat a motion for summary judgment." *Conway v. Microsoft Corp.*, 414 F. Supp. 2d 450, 464 (S.D.N.Y. 2006); *see Barney v. Consol. Edison Co. of N.Y.*, 391 F. App'x

---

[8]  Defendant notes that Plaintiff and Birmingham were subject to different collective bargaining agreements.  (Def. Mem. 15.)  Although Defendant asserts that "the terms and conditions of Plaintiff's employment were governed by [his] Union's CBA," there is no evidence before the Court that Defendant's Sexual Harassment Policy was applied differently to employees based on the terms of their respective collective bargaining agreements.

993, 996 (2d Cir. 2010) (no reasonable jury could find that plaintiff was similarly situated to co-worker, where plaintiff "intentionally entered false overtime data in order to receive more pay and then attempted to cover it up," and the coworker "merely failed to review [plaintiff's] overtime entries correctly, conduct from which [the co-worker] did not stand to benefit"); *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 568 (2d Cir. 2000) (plaintiff who "engaged in a physical fight" was not similarly situated to co-workers whose "behavior — offensive thought it may have been — involved words only"). Both Plaintiff and Birmingham engaged in sexually inappropriate conduct. (Def. 56.1 ¶¶ 174–75; Pl. 56.1 ¶¶ 174–75.) However, there are a number of disputed facts regarding the seriousness of Plaintiff's conduct. First, the parties dispute the contents of the photograph — whether it showed Birmingham's knee and lower thigh or something more explicit. (*Compare* Pl. Dep. 126:19, 129:13–14; *and* Wilson Decl. ¶ 6; *with* Hawkins Aff. ¶¶ 6, 8.) Second, the parties dispute whether Plaintiff actively showed the photograph to his co-workers, or whether he gave his telephone to Hawkins, who shared the photograph with others. (Def. 56.1 ¶ 75; Pl. 56.1 ¶ 75.) Moreover, Defendant's own human resources representative, Robbins, testified that Birmingham's conduct was worse than Plaintiff's. (Robbins Dep. 70:2–25.) Furthermore, whether Plaintiff's conduct, centering around one violation of Defendant's Sexual Harassment Policy, is more serious than Birmingham's ongoing sexually explicit behavior, is a decision best left for the jury. *See Temple v. City of New York*, No. 06-CV-2162, 2010 WL 3824116, at *8–9 (E.D.N.Y. Sept. 23, 2010) (although plaintiff's supervisor concluded that plaintiff's conduct was "more egregious than that of her comparators, factual issues concerning comparable conduct such as those presented in this case are appropriately resolved by a jury" (citing *Graham*, 230 F.3d at 42–43)).

Defendant also argues that Plaintiff's conduct was more serious because Plaintiff contacted Birmingham demanding that she withdraw her complaint against him after he was instructed by Robbins not to have any contact with Birmingham, and "used his position as President of the Union to coerce co-workers into signing statements that he prepared in support of his complaint against Birmingham." (Def. Mem. 20.) These facts are disputed by Plaintiff. Although Plaintiff admits that he approached Birmingham and requested that she rescind her complaint against him, he maintains that Robbins never instructed him not to approach Birmingham. (Pl. Decl. ¶ 4.) Plaintiff states that, to the contrary, Robbins told him that the investigation would cease if Birmingham rescinded her complaint. (*Id.*) Plaintiff's contact of Birmingham was not necessarily unreasonable, especially in light of the evidence indicating that Birmingham had not initially wanted to file the complaint in the first place and later attempted to rescind the complaint. (*See e.g.*, Pl. Decl. ¶ 4; Wilson Decl. ¶ 11; Scott Decl. ¶ 8.) Plaintiff also maintains that he did not threaten or coerce Klein, Garrant or Krieger into submitting statements on his behalf, and this is supported by statements from Garrant and Kriegar. (Pl. Dep. 225:7–226:5; Garrant Dep. 16:9–18, 22:17–22; Krieger Decl. ¶ 5.) Although Klein allegedly told Robbins that he felt pressured into giving a statement, Plaintiff testified that, at the time he obtained Klein's statement, Klein did not say or do anything that would suggest that he was uncomfortable signing the statement. (Pl. 56.1 ¶¶ 153–154.2; Pl. Dep. 225:7–25.) Based on this evidence, a reasonably jury could conclude that Birmingham engaged in conduct that was as serious as, if not more serious than, Plaintiff.[9]

---

[9] Defendant further argues that Plaintiff's failure to file his complaint against Birmingham before his own conduct was investigated requires dismissal. (Def. Mem. 22.) Plaintiff has explained why he did not previously file his complaint, and he has provided evidence that he, and others, did not appreciate Birmingham's explicit sexual behavior. (Pl. Dep.

### C.    Different Treatment

Plaintiff has established that Birmingham was treated more favorably than he was.  *See Berube*, 348 F. App'x at 686 (holding that the plaintiff "proffered sufficient evidence to make out a *prima facie* claim of discriminatory intent by demonstrating that younger, similarly-situated employees" were treated "more favorably" than he was); *Williams v. Alterra Assisted Living Home Health Corp./Brookdale*, No. 07-CV-0492, 2010 WL 5072587, at *6 (W.D.N.Y. Dec. 10, 2010) ("[T]o satisfy a prima facie case, Plaintiff must show that these similarly situated employees were treated more favorably.").  Both Birmingham and Plaintiff engaged in sexually explicit conduct and filed sexual harassment complaints.  Construing the evidence in the light most favorable to Plaintiff, Plaintiff was constructively discharged, while Birmingham was not disciplined.  A reasonably jury could conclude that Plaintiff and Birmingham shared sufficient employment characteristics to be considered similarly situated, "engaged in conduct of comparable seriousness, the consequences for which were then applied inconsistently."  *Temple*, 2010 WL 3824116, at *8.

Plaintiff has presented sufficient evidence to demonstrate that there are genuine issues of material fact as to the existence of a prima facie case of gender discrimination based upon the alleged disparate disciplinary treatment by Defendant.

### ii.    Non-Discriminatory Explanation

Once a prima facie case of gender discrimination has been established, a presumption of discrimination arises, and Defendant must articulate a "legitimate, non-discriminatory reason for the employment action."  *Broich v. Inc. Vill. of Southampton*, 462 F. App'x 39, 42 (2d Cir. 2012)

---

at 108:5–112:24, 121:16–21, 142:20–143:6, 195:13–196:24, 221:1–222:15; Horn Dep. 10:3–13:15; Wilson Decl. ¶ 5; Krieger Decl. ¶ 5; Scott Decl. ¶ 5.)  It is for the jury to determine how to assess the timing of Plaintiff's complaint.

(quoting *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000)), *cert. denied*, 568 U.S. ---, ---, 133 S.Ct. 527 (2012). An employer's burden to overcome the presumption of discrimination "is not a particularly steep hurdle." *Hyek*, 702 F. Supp. 2d at 93. It "is one of production, not persuasion; it can involve no credibility assessment." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000); *see also Lambert v. McCann Erickson*, 543 F. Supp. 2d 265, 278 (S.D.N.Y. 2008) (using the *Reeves* standard). Defendant argues that Plaintiff was not terminated, but was facing yet-to-be-determined discipline for his violation of the company's sexual harassment policies. (Def. Mem. at 19–20.) Thus, Defendant satisfies its burden. Plaintiff must, therefore, meet his burden of demonstrating that the legitimate reason proffered by Defendant is pretext. *Fincher*, 604 F.3d at 720.

### iii. Pretext

To avoid summary judgment, Plaintiff must offer evidence from which a reasonable jury could conclude by a preponderance of the evidence that gender discrimination played a role in the adverse action taken by Defendant. *Summa v. Hofstra Univ.*, 708 F.3d 115, 125 (2d Cir. 2013). A "plaintiff is not required to show that the employer's proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons and that the prohibited factor was at least one of the 'motivating' factors." *Holcomb*, 521 F.3d at 138 (quoting *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 203 (2d Cir. 1995)); *see also Nassar*, 570 U.S. at ---, 133 S.Ct. at 2526; *Garcia v. Hartford Police Dep't*, 706 F.3d 120, 127 (2d Cir. 2013). At the pretext stage, "[a] court may re-consider evidence presented to find an inference of discrimination at the prima facie stage." *Ingenito v. Riri USA, Inc.*, No. 11-CV-2569, 2013 WL 752201, at *12 (E.D.N.Y. Feb. 27, 2013); *see Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 173 (2d Cir. 2006) (holding that a plaintiff may demonstrate pretext "either by the presentation of additional evidence showing that the employer's proffered explanation is unworthy of credence,

or by reliance on the evidence comprising the prima facie case, without more"); *Back v. Hastings on Hudson Union Free Sch. Dist.*, 365 F.3d 107, 124 (2d Cir. 2004) ("[T]he plaintiff may, depending on how strong it is, rely upon the same evidence that comprised her prima facie case, without more."); *see also Herbert*, 748 F. Supp. 2d at 241 ("To defeat summary judgment, [plaintiff] need only show that 'the evidence taken as a whole, supports a sufficient rational inference of discrimination.'" (citations omitted)).

Plaintiff argues that the alleged disparate treatment of Birmingham presented to establish his prima facie case also demonstrates that Defendant's explanation for his alleged constructive discharge is pretextual. *See Graham*, 230 F.3d at 43 ("A showing that similarly situated employees belonging to a different [protected] group received more favorable treatment can also serve as evidence that the employer's proffered legitimate, non-discriminatory reason for the adverse job action was a pretext for racial discrimination." (citing *Hargett*, 78 F.3d at 939)); *Temple*, 2010 WL 3824116, at *10 ("The Second Circuit has stated that, '[a] showing that similarly situated employees belonging to a different racial group received more favorable treatment can also serve as evidence that the employer's proffered legitimate, non-discriminatory reason for the adverse job action was a pretext for racial discrimination.'" (quoting *Graham*, 230 F.3d at 43)). Defendant argues that it is entitled to summary judgment because Plaintiff "engaged in more egregious misconduct than Birmingham." (Def. Mem. 14.) Plaintiff's conduct, while certainly inappropriate, could be perceived as relatively minor — taking a photograph of Birmingham and Hawkins at the same time as a number of other male coworkers, allowing Hawkins to view the photograph on his telephone, talking to Birmingham about her complaint, and asking coworkers to submit statements on his behalf — especially when compared to the ongoing, sexually explicit conduct in which Birmingham engaged. However,

this is an issue of fact to be determined by a jury. *See Graham*, 230 F.3d at 39 ("Whether two employees are similarly situated ordinarily presents a question of fact for the jury.").

Defendant argues that, even if it was incorrect in determining that Plaintiff engaged in more egregious conduct than Birmingham, that is insufficient to show discrimination. While Defendant is correct that unfairness or employer error is not enough to demonstrate discriminatory animus, "[t]o defeat summary judgment, [plaintiff] need only show that 'the evidence taken as a whole, supports a sufficient rational inference of discrimination.'" *Herbert*, 748 F. Supp. 2d at 241 (citations omitted)); *see Desir v. City of New York*, 453 F. App'x 30, 34 (2d Cir. 2011) ("In short, the question becomes whether the evidence, taken as a whole, supports a sufficient rational inference of discrimination." (quoting *Weinstock*, 224 F.3d at 42)). Plaintiff has presented evidence that both he and Birmingham violated Defendant's Sexual Harassment Policy and filed sexual harassment complaints, and that Defendant conducted an investigation, after which Birmingham suffered no disciplinary action, while Plaintiff was constructively discharged. Reviewing the evidence in the light most favorable to Plaintiff, the Court finds that Plaintiff has presented disputed issues of fact such that a reasonable jury could conclude that Plaintiff was subjected to disparate disciplinary treatment by Defendant on the basis of his gender. Defendant's motion for summary judgment as to Plaintiff's gender discrimination claims is denied.

    **c.   Hostile Work Environment**

Plaintiff has failed to sufficiently establish a hostile work environment claim. In order to establish a hostile work environment claim, a plaintiff must produce evidence that the complained of conduct "(1) is objectively severe or pervasive — that is, creates an environment that a reasonable person would find hostile or abusive; (2) creates an environment that the plaintiff subjectively perceives as hostile or abusive; and (3) creates such an environment

because of the plaintiff's sex, or another protected characteristic." *Robinson v. Harvard Prot. Servs.*, 495 F. App'x 140, 141 (2d Cir. 2012) (internal quotation marks omitted) (quoting *Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007)).[10] To withstand summary judgment, Plaintiff must produce evidence that "the workplace was 'so severely permeated with discriminatory intimidation, ridicule, and insult, that the terms and conditions of [his] employment were thereby altered.'" *Mills*, --- F. App'x at ---, 2013 WL 2157955, at *2 (quoting *Desardouin v. City of Rochester*, 708 F.3d 102, 105 (2d Cir. 2013)). "Generally, unless an incident of harassment is sufficiently severe, 'incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.'" *Das v. Consol. Sch. Dist. of New Britain*, 369 F. App'x 186, 189–90 (2d Cir. 2010) (quoting *Alfano v. Costello*, 294 F. 3d 365, 374 (2d Cir. 2002)). The plaintiff must also establish that the hostile work environment can be imputed to the employer in order to establish employer liability for hostile actions taken by its employees.[11] *See Vance v. Ball State Univ.*, 570 U.S. ---, ---, 133 S. Ct. 2434, 2443 (2013) (explaining under what circumstances an employer may be held liable for harassment by an employee); *Summa*, 708 F.3d at 124 (holding that "[i]n order to prevail on a hostile work environment claim," a plaintiff

---

[10] The same standards apply to the plaintiff's hostile environment claim arising under the NYSHRL. *See Summa v. Hofstra Univ.*, 708 F.3d 115, 123–24 (2d Cir. 2013) ("Hostile work environment claims under both [federal law] and the NYSHRL are governed by the same standard." (citing *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 609 (2d Cir. 2006))); *Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.*, 716 F.3d 10, 14 (2d Cir. 2013) (per curiam) ("The standards for evaluating hostile work environment . . . claims are identical under Title VII and the NYSHRL.") Therefore, Plaintiff's Title VII and NYSHRL hostile work environment claims are analyzed together for purposes of this motion.

[11] Where the harasser is a supervisor, an individual "empowered to take tangible employment actions against the victim," and "the supervisor's harassment culminates in a tangible employment action, the employer is strictly liable." *Vance v. Ball State Univ.*, 570 U.S. ---, ---, 133 S. Ct. 2434, 2439 (2013). However, where the harasser is a co-worker, "the employer is liable only if it was negligent in controlling working conditions." *Id.*

must demonstrate "that there is a specific basis for imputing the conduct creating the hostile work environment to the employer" (quoting *Duch v. Jakubek*, 588 F.3d 757, 762 (2d Cir. 2009))); *Smith v. HBO*, No. 12-CV-2177, 2013 WL 2285185, at *2 (E.D.N.Y. May 22, 2013) ("Plaintiff must also plead enough facts that the hostile work environment can be imputed to the employer in order to establish employer liability for hostile actions taken by its employees.").

"While the central statutory purpose[ of Title VII was] eradicating discrimination in employment, Title VII does not set forth a general civility code for the American workplace." *Redd*, 678 F.3d at 176 (alteration in original) (citations and internal quotation marks omitted). The Second Circuit distinguishes between "[complaints of] sexual assaults; [other] physical contact[, whether amorous or hostile, for which there is no consent express or implied]; uninvited sexual solicitations; intimidating words or acts; [and] obscene language or gestures" and "the occasional vulgar banter, tinged with sexual innuendo, of coarse or boorish workers," which are not protected under the law. *Redd*, 678 F.3d at 177 (alteration in original) (citations omitted). "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment — an environment that a reasonable person would find hostile or abusive — is beyond Title VII's purview." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21–22 (1993). "Isolated incidents generally will not suffice to establish a hostile work environment unless they are extraordinarily severe." *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 547 (2d Cir. 2010). "In other words, '[s]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment.'" *Illiano v. Mineola Union Free Sch. Dist.*, 585 F. Supp. 2d 341, 350 (E.D.N.Y. 2008) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)).

Plaintiff has presented evidence that co-workers in the radiology department, specifically Birmingham and Hawkins, spoke frequently about their sex lives and showed explicit photographs in the workplace, creating an uncomfortable and inappropriate work environment. However, Plaintiff has not established that the sexual conduct or the inappropriateness of the environment was gender-based. *See Smith*, 2013 WL 2285185, at *4 (finding that where the plaintiff alleged "that her female supervisor treated other females more favorably than [p]laintiff, she ha[d] not sufficiently pled that any of her unfavorable treatment was due to her gender"); *Fattoruso v. Hilton Grand Vacations Co.*, 873 F. Supp. 2d 569, 578–79 (S.D.N.Y. 2012) (dismissing complaint where there was "nothing that indicates that plaintiff was treated 'unequally' based upon his gender" and because the complaint "fail[ed] to allege specific acts to support a claim that the work environment was hostile to *men* — 'unfairness' does not equate to hostility, no matter how inequitable" (emphasis in original)); *Dottolo v. Byrne Dairy, Inc.*, No. 08-CV-0390, 2010 WL 2560551, at *5 (N.D.N.Y. June 22, 2010) (dismissing the complaint because the plaintiff had failed "to allege facts plausibly suggesting that [the defendant] posited an unwelcome question to [the plaintiff] because of his sex"); *Krasner v. HSH Nordbank AG*, 680 F. Supp. 2d 502, 516 (S.D.N.Y. 2010) (dismissing the hostile work environment claim "because none of the alleged acts of harassment committed directly against [the plaintiff] — either when viewed in isolation or in conjunction with any potential discrimination against women — support a claim that [he] is being harassed because he is a male employee" (internal quotation marks omitted)).

Plaintiff asserts that he was uncomfortable during these inappropriate conversations, but he admits that he engaged in some the sexual discussions and participated in some of the inappropriate conduct. (Pl. Dep. 172:16–25.) He does not allege that the sexual comments were

directed to, or personally insulting to him in any way or to males in particular, nor does he demonstrate that they were obviously intended to intimidate, ridicule, or demean him on account of his gender or any other protected characteristic. *See Wells-Williams v. Kingsboro Psychiatric Center*, No. 03-CV-134, 2007 WL 1011545, at *4 (EDNY March 30, 2007) (although plaintiff asserts that she was uncomfortable and under "duress" during the offensive conversations, she did not allege that the offenders' comments were "personally insulting to her in any way, nor [did] she demonstrate that they were obviously intended to intimidate, ridicule, or demean her on account of a protected characteristic"). Plaintiff testified that Birmingham's conduct was directed at both men and women, and that "a lot of people" found her conduct offensive. (Pl. Dep. 111:16–19, 121:16–21.) For example, Plaintiff has provided evidence that Susan Horn, a female nurse, found Birmingham's alleged actions made the work environment "uncomfortable." (Pl. Opp'n 21.) "Obscene language or gestures" and "the occasional vulgar banter, tinged with sexual innuendo, of coarse or boorish workers" do not amount to a hostile work enivronment. *Redd*, 678 F.3d at 177. Plaintiff's contention that the radiology department was a sexually-charged and inappropriate workplace for all employees, both male and female, is simply not actionable. *See Jerram v. Cornwall Cent. Sch. Dist.*, 464 F. App'x 13, 15 (2d Cir. 2012) (affirming the district court's grant of summary judgment to defendants on plaintiff's hostile work environment claim, where the evidence showed that "men and women alike" found the offender abrasive and disrespectful, the offender subjected others to similar behavior, and "there is little evidence that [the offender] treated women any worse than he treated men"); *Smith*, 2013 WL 2285185, at *4 (dismissing plaintiff's hostile work environment claim because, among other thing, plaintiff failed to "sufficiently [plead] that any of her unfavorable treatment was due to her gender"); *Krasner*, 680 F. Supp. 2d at 519 (dismissing hostile work environment claims where

plaintiff failed to demonstrate that "he was singled out for mistreatment because of [his] sex");

*Wells-Williams*, 2007 WL 1011545, at *4 (granting defendant summary judgment on sexual

harassment claim where "the work environment was equally unprofessional for both men and

women"). Defendant's motion for summary judgment is granted as to Plaintiff's hostile work

environment claims.

### d. Retaliation

Plaintiff claims that he was terminated in retaliation for filing a complaint against

Birmingham for sexual harassment. (Pl. Opp'n 23–24.) Claims of retaliation for engaging in

protected conduct under Title VII are examined under the *McDonnell Douglas* burden shifting

test.[12] *McDonnell Douglas Corp. v. Green*, 411 U.S. 742, 802 (1973); *see Summa*, 708 F.3d at

---

[12] Traditionally, "[t]he standards for evaluating . . . retaliation claims are identical under Title VII and the NYSHRL." *Kelly*, 716 F.3d at 14 (citing *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 n. 1 (2d Cir. 2000)); *Vandewater v. Canandaigua Nat. Bank*, 893 N.Y.S.2d 916 (2010) ("It is well settled that the federal standards under [T]itle VII of the Civil Rights Act of 1964 are applied to determine whether recovery is warranted under the Human Rights Law." (citing *Forrest v. Jewish Guild for the Blind*, 3 N.Y.3d 295, 330 (2004))); *Forrest*, 3 N.Y.3d at 330 (stating that "[b]ecause both the Human Rights Law and [T]itle VII address the same type of discrimination, afford victims similar forms of redress, are textually similar and ultimately employ the same standards of recovery, federal case law in this area also proves helpful to the resolution of this appeal" (quoting *Matter of Aurecchione*, 98 N.Y.2d 21, 26 (2002)). New York State courts have yet to address the impact of the Supreme Court's recent holding in *Nassar* on the NYSHRL, nor has the Second Circuit provided the district courts of this Circuit with guidance as to this issue. However, the relevant provisions of Title VII and NYSHRL are textually similar, and both prohibit an employer from discriminating or retaliating against an individual "because" he or she engaged in protected activity. In *Nassar*, the Supreme Court held that under "the default rules" of statutory construction, "causation" should be interpreted as "but-for causation" "absent an indication to the contrary in the statute itself," and interpreted Title VII's use of "because" as requiring "proof that the desire to retaliate was the but-for cause of the challenged employment action." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. ---, ---, 133 S. Ct. 2517, 2525, 2528 (2013). Since the NYSHRL statutory language is the same, and the New York Court of Appeals has consistently stated that federal Title VII standards are applied in interpreting the NYSHRL, this Court will continue to interpret the standard for retaliation under NYSHRL consistent with Title VII jurisprudence, as clarified by the Supreme Court in *Nassar*. *See, e.g.*, *Brown v. City of New York*, No. 11-CV-2915, 2013 WL 3789091, at *19 (S.D.N.Y. July 19, 2013) (reviewing the but-for causation requirement for Title VII retaliation articulated in

125 ("The burden-shifting framework laid out in *McDonnell Douglas* . . . governs retaliation claims under . . . Title VII").  Under the test, "[f]irst, the plaintiff must establish a *prima facie* case of retaliation.  If the plaintiff succeeds, then a presumption of retaliation arises and the employer must articulate a legitimate, non-retaliatory reason for the action that the plaintiff alleges was retaliatory."  *Fincher*, 604 F.3d at 720 (citations omitted); *see also Tepperwien v. Entergy Nuclear Operations, Inc*., 663 F.3d 556, 568 n.6 (2d Cir. 2011) (discussing the burden shifting analysis in retaliation context); *Jute v. Hamilton Sundstrand Corp*., 420 F.3d 166, 173 (2d Cir. 2005) (same).  If the employer succeeds at the second stage, then the presumption of retaliation dissipates, and the plaintiff must show that, but for the protected activity, he would not have been terminated.  *See Nassar*, 570 U.S. at ---, 133 S. Ct. at 2534 (holding that a plaintiff "must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer"); *see also Moore v. Kingsbrook Jewish Med. Ctr.*, No. 11-CV-3625, 2013 WL 3968748, at *14 (E.D.N.Y. July 30, 2013) (stating that once the employer succeeds at the second stage, "the presumption of retaliation dissipates, and the plaintiff must show that, but for the protected activity, he would not have been terminated" (citing *Nassar*, 570 U.S. at ---, 133 S. Ct. at 2534)); *Brooks v. D.C. 9 Painters Union*, No. 10-CV-7800, 2013 WL 3328044, at *4 (S.D.N.Y. July 2, 2013) ("If the defendant [articulates a legitimate, non-retaliatory reason], the plaintiff must offer 'proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer.'"  (quoting *Nassar*, 570 U.S. at ---, 133 S. Ct. at 2534)).

---

*Nassar* and stating that the plaintiff's "retaliation claim under the NYSHRL is 'analytically identical to [her] claims brought under Title VII'" (citation omitted)).

### i.    Prima Facie Case

In order to establish a prima facie case of retaliation, a plaintiff must establish

(1) participation in an activity protected by federal discrimination statute; (2) the defendant was

aware of this activity; (3) an adverse employment action; and (4) a causal connection between

the alleged adverse action and the protected activity. *Kelly v. Howard I. Shapiro & Assocs.*

*Consulting Eng'rs, P.C.*, 716 F.3d 10, 14 (2d Cir. 2013) (per curiam) (citing *Lore v. City of*

*Syracuse*, 670 F.3d 127, 157 (2d Cir. 2012)); *Summa*, 708 F.3d at 125; *Schiano v. Quality*

*Payroll Sys., Inc.*, 445 F.3d 597, 608 (2d Cir. 2006).  The burden at the summary judgment stage

for Plaintiff is "'minimal' and '*de minimis*,'" and "the court's role in evaluating a summary

judgment request is to determine only whether proffered admissible evidence would be sufficient

to permit a rational finder of fact to infer a retaliatory motive." *Jute*, 420 F.3d at 173 (citations

omitted).  Defendant argues that Plaintiff did not engage in "protected activity," was not subject

to any adverse action and cannot establish the required "causal connection."  (Def. Mem. 15–18.)

### 1.    Protected Activity

Plaintiff alleges that he was fired for filing a sexual harassment complaint against

Birmingham on January 13, 2012.  (Pl. Opp'n 23–24.)  Under Title VII, protected activity

includes both "opposing discrimination proscribed by the statute and . . . participating in Title

VII proceedings."[13] *Jute*, 420 F.3d at 173; *see also Tepperwien*, 663 F.3d at 567 ("Title VII . . .

prohibits an employer from taking 'materially adverse' action against an employee because the

employee opposed conduct that Title VII forbids or the employee otherwise engaged in protected

activity." (citations omitted)); *Hicks v. Baines*, 593 F.3d 159, 161 (2d Cir. 2010) ("Title VII's

---

[13]  The New York State Human Rights Law contains similar language prohibiting discrimination "against any person because he or she has opposed any practices forbidden under this article or because he or she has filed a complaint, testified or assisted in any proceeding under this article."  N.Y. Exec. Law § 296(1)(e).

anti-retaliation provision makes it unlawful 'for an employer to discriminate against any . . . employee[ ] . . . because [that employee] opposed any practice' made unlawful by Title VII or 'made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.'" (alterations in original) (quoting 42 U.S.C. § 2000e-3(a))). Title VII's antiretaliation provision is "construed to cover a broad range of employer conduct." *Thompson v. N. Am. Stainless, LP*, 562 U.S. ---, ---, 131 S. Ct. 863, 868 (2011). It is not necessary that the conduct was actually prohibited by Title VII, but only that the plaintiff had a "good faith belief" that such conduct was prohibited. *La Grande v. DeCrescente Distrib. Co.*, 370 F. App'x. 206, 212 (2d Cir. 2010) ("It is well-established that a 'plaintiff may prevail on a claim for retaliation even when the underlying conduct complained of was not in fact unlawful so long as he can establish that he possessed a good faith, reasonable belief that the underlying challenged actions of the employer violated [the] law.'" (quoting *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002))); *Kanhoye v. Altana Inc.*, 686 F. Supp. 2d 199, 206 (E.D.N.Y. 2009) ("'An employee is privileged to report and protest workplace discrimination, whether that discrimination be actual or reasonably perceived.' Title VII therefore prohibits an employer from retaliating against an employee for opposing the employer's potentially discriminatory practices." (quoting *Matima v. Celli*, 228 F.3d 68, 78 (2d Cir. 2000))). When making the complaint, Plaintiff must do so in "sufficiently specific terms so that the employer is put on notice that the plaintiff believes he or she is being discriminated against on the basis of race, gender, or national origin." *Brummell v. Webster Central School Dist.*, No. 06–CV–6437, 2009 WL 232789, at *6 (W.D.N.Y. Jan. 29, 2009).

Plaintiff filed a formal complaint of sexual harassment. (Def. 56.1 ¶ 156; Pl. 56.1 ¶ 156; Robbins Aff. ¶ 24.) Defendant argues that Plaintiff cannot demonstrate that his complaint was

made reasonably and in good faith, as Plaintiff did not lodge a complaint of discrimination against Birmingham until *after* learning of the complaint Birmingham filed against him.  (Def Reply 9.)  Defendant maintains that the timing alone demonstrates that Plaintiff did not reasonably believe he had been a victim of harassment, but rather that he filed the complaint in retaliation and as a means of avoiding disciplinary actions for his own misconduct.  (*Id.*)  Plaintiff's sworn testimony is that he waited until January 13, 2010 to file a complaint against Birmingham because he was afraid of retaliation and did not want to "cause problems," but by filing her complaint, Birmingham "made it fair to go out and complain."  (Pl. Dep. 142:20–143:6; *see also id.* at 221:2–222:15.)[14]

A jury could conclude based on Plaintiff's testimony that Plaintiff was offended by Birmingham's behavior and filed a good-faith sexual harassment complaint against her on that basis.  (*Id.*)  *See, e.g. Hicks*, 593 F.3d at 170 (finding that plaintiffs' sworn affidavits were sufficient evidence to survive a summary judgment motion).

### 2.   Knowledge

Plaintiff has established that Defendant knew of his protected activity.  "In order to satisfy the requirement of employer knowledge, an employee must have made it clear that she was opposing activity made illegal by Title VII."  *Risco v. McHugh*, No. 10-CV-6314, 2012 WL 2161115, at *20 (S.D.N.Y. June 14, 2012).  It is not necessary that Plaintiff prove that the specific actors knew of the protected activity as long as Plaintiff can demonstrate general

---

[14]  Defendant argues that Plaintiff admitted that he filed his sexual harassment complaint in retaliation, pointing to a portion of Plaintiff's deposition in which, when asked "You made a complaint against her because she made a complaint against you?," he answered "Yes."  (Pl. Dep. 194:22–195:5.)  However, in the same deposition, Plaintiff testified that he found Birmingham's conduct offensive prior to the filing of his complaint but did not feel free to file a complaint until she "made it fair to go out and complain."  (Pl. Dep. at 142:20–143:6, 221:2–222:15.)

corporate knowledge.  *See Henry v. Wyeth Pharmaceuticals, Inc.*, 616 F.3d 134, 148 (2d Cir. 2010) ("[A] jury may 'find retaliation even if the agent denies direct knowledge of a plaintiff's protected activities, for example, so long as the jury finds that the circumstances evidence knowledge of the protected activities or the jury concludes that an agent is acting explicitly or implicit[ly] upon the orders of a superior who has the requisite knowledge.'" (alteration in original) (quoting *Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000))); *Trivedi v. N.Y. Unified Court Sys. Office of Court Admin.*, 818 F. Supp. 2d 712, 736 (S.D.N.Y. 2011) ("A plaintiff need not prove that the specific actors within an organization were aware that the plaintiff made allegations of retaliation to make out a *prima facie* retaliation claim; rather, 'general corporate knowledge that the plaintiff has engaged in a protected activity' is sufficient." (citations omitted)).  Defendants admit that "[a]t or about January 13, 2010, Plaintiff filed a complaint against Ms. Birmingham for sexual harassment."  (Def. 56.1 ¶ 125.)  Although Defendants believe that Plaintiff filed the complaint to retaliate against Birmingham, this is a factual issue to be decided by the jury.  Since Defendant knew Plaintiff filed a formal sexual harassment complaint against Birmingham, Plaintiff has established that Defendant had knowledge of his protected activity.

### 3.  Adverse Employment Action

Construing all the evidence and drawing all inferences in Plaintiff's favor, Plaintiff also satisfies the adverse employment action prong.  As discussed above, Plaintiff has offered sufficient evidence from which a reasonable jury could conclude that he was constructively discharged.  (*See supra* Part II.b.i.1.)  Constructive discharge is considered an adverse employment action sufficient to support a retaliation claim.  *See Civil Serv. Emps. Ass'n, Inc., Local 1000, AFSCME, AFL-CIO v. N.Y. Dep't of Parks, Recreation & Historic Pres.*, 689 F.

Supp. 2d 267, 280 (N.D.N.Y. 2010) (holding that the "adverse employment action" element of plaintiff's retaliation claim "includes discharge from employment by constructive discharge").

### 4. Causation

Drawing all inferences in favor of Plaintiff, Plaintiff has established a causal connection between his protected activity and his termination. "[A] plaintiff can indirectly establish a causal connection to support a discrimination or retaliation claim by showing that the protected activity was closely followed in time by the adverse employment action."[15] *Gorzynski*, 596 F.3d at 110–11 (quoting *Gorman-Bakos v. Cornell Coop. Extension of Schenectady Cnty.*, 252 F.3d 545, 554 (2d Cir. 2001)); *see also Kim v. Columbia Univ.*, 460 F. App'x 23, 25 (2d Cir. 2012) ("[T]emporal proximity between protected activity and adverse action may be sufficient to satisfy the causality element of a prima facie retaliation claim . . . ."); *Feingold*, 366 F.3d at 156 ("[T]he requirement that [plaintiff] show a causal connection between his complaints and his termination is satisfied by the temporal proximity between the two."). There is no bright line rule for how long after a plaintiff has engaged in the protected activity that the adverse action must have occurred to benefit from the inference but generally courts measure the time in months. *See, e.g. Gorzynski*, 596 F.3d at 110–11 ("Though [the Second Circuit] has not drawn a bright line defining, for the purposes of a prima facie case, the outer limits beyond which a

---

[15] The Supreme Court has recently ruled that under Title VII, a plaintiff "must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer." *Nassar*, 570 U.S. at ---, 133 S.Ct. at 2534. While temporal proximity alone may still be sufficient at the prima facie stage, it is not sufficient at the pretext stage. *Compare Rivera v. N.Y.C. Dep't of Correction*, No. 06-CV-862, 2013 WL 3297597, at *4 (E.D.N.Y. June 28, 2013) (incorporating the "but-for" causation standard into the prima facie case); *with Moore v. Kingsbrook Jewish Med. Ctr.*, No. 11-CV-3625, 2013 WL 3968748, at *14 (E.D.N.Y. July 30, 2013) (analyzing the "but-for" causation standard at the pretext stage); *Brooks v. D.C. 9 Painters Union*, No. 10-CV-7800, 2013 WL 3328044, at *4 (S.D.N.Y. July 2, 2013) (stating that "but for" causation must be proved if the defendant articulates a legitimate, non-retaliatory reason for the adverse employment action).

temporal relationship is too attenuated to establish causation, [it has] previously held that five months is not too long to find the causal relationship."); *Smith v. Town of Hempstead Dept. of Sanitation Sanitary Dist. No. 2*, 798 F. Supp. 2d 443, 457 (E.D.N.Y. 2011) ("With regard to the establishment of a prima facie case through temporal proximity, the Second Circuit has not drawn a bright line as to how closely an adverse employment action must follow protected activity to imply that retaliation has taken place." (citing *Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009)); *Laudadio v. Johanns*, 677 F. Supp. 2d 590, 614 (E.D.N.Y. 2010) ("There is no bright-line beyond which a temporal relationship is too attenuated to prove causation." (citations omitted)). Here, Plaintiff was arguably constructively discharged two days after filing his sexual harassment complaint against Birmingham, thereby satisfying the temporal proximity requirement.

### ii. Non-Discriminatory Explanation

Since Plaintiff has established a prima facie case of retaliation, a presumption of retaliation arises and Defendant must articulate a legitimate reason for Plaintiff's termination. *Fincher*, 604 F.3d at 720. Defendant argues that Plaintiff was not terminated, but was facing yet-to-be-determined discipline for his violation of the company's sexual harassment policies. (Def. Mem. at 19–20.) Therefore, Defendant satisfies its burden.

### iii. Pretext

Although Plaintiff has established a prima facie case of retaliation, Plaintiff cannot prove that but for his sexual harassment complaint, he would not have been terminated. Under the recent Supreme Court decision in *Nassar*, "Title VII retaliation claims must be proved according to traditional principles of *but-for* causation . . . . This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." 570 U.S. at ---, 133 S. Ct. at 2533. Therefore, during the final stage of the burden

shifting framework, the plaintiff must show that retaliation was a but-for cause of the adverse

employment action. *See Moore*, 2013 WL 3968748, at *14 (E.D.N.Y. July 30, 2013) (holding

that after *Nassar*, "the plaintiff must show that retaliation was a but-for cause of the adverse

employment action" during the final stage of the burden shifting framework); *Brooks,* 2013 WL

3328044, at *4 (S.D.N.Y. July 2, 2013) (stating that "but for" causation must be proved if the

defendant articulates a legitimate, non-retaliatory reason for the adverse employment action).

Plaintiff has not and cannot do so.

  Although Plaintiff's termination occurred two days after he filed his sexual harassment

complaint, that alone cannot sustain his retaliation claim. Even under the previous lesser

"motivating factor" standard, "temporal proximity — while enough to support a prima facie case

— [was] insufficient to establish pretext." *Ben-Levy v. Bloomberg, L.P.*, --- F. App'x ---, ---,

2013 WL 1810953, at *2 (2d Cir. May 1, 2013); *see also Govori v. Goat Fifty, L.L.C.*, --- F.

App'x ---, ---, 2013 WL 1197770, at *2 (2d Cir. Mar. 26, 2013) (summary order) ("[W]hile

temporal proximity between events may give rise to a *prima facie case* of discrimination, 'such

temporal proximity is insufficient to satisfy [plaintiff's] burden to bring forward some evidence

of pretext.'" (quoting *El Sayed v. Hilton Hotels Corp*., 627 F.3d 931, 933 (2d Cir. 2010))).

  In order to establish but-for causation, Plaintiff would have to prove that his termination

would not have occurred in the absence of a retaliatory motive. Defendant has established that it

perceived Plaintiff as having violated its Sexual Harassment Policy, and intimidating Union

members into filing statements in support of his complaint. (Def. 56.1 ¶¶ 150–53, 174.) The

terms of Defendant's Sexual Harassment Policy are clear — any violation may result in

disciplinary actions, including discharge. (Def. 56.1 ¶ 15.) Defendant has also demonstrated

that Plaintiff was facing discipline in response to his own conduct, not his sexual harassment

complaint.  (Def. 56.1 ¶ 184.)  Taking the evidence in the light most favorable to Plaintiff, a reasonable jury could conclude that Plaintiff's termination was discriminatory, since Defendant applied its Sexual Harassment Policy to Plaintiff differently than Birmingham.  However, based on the evidence in the record, a reasonable jury could not conclude that had Plaintiff not filed a sexual harassment complaint against Birmingham, he would not have been terminated after Defendant's investigation into Birmingham's complaint of sexual harassment against Plaintiff. Defendant's motion for summary judgment as to Plaintiff's retaliation claims is granted.

**III.  Conclusion**

For the foregoing reasons, Defendant's motion for summary judgment is denied as to Plaintiff's gender discrimination claims and granted as to Plaintiff's hostile work environment and retaliation claims.


SO ORDERED:


_____s/ MKB_____
MARGO K. BRODIE
United States District Judge


Dated: August 14, 2013
       Brooklyn, New York